**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.21-50162 |
| *Plaintiff-Appellee*, | D.C. No. 8:16-cr-00076-JVS-7 |
| v. | |
| JAMES R. MILHEISER, | |
| *Defendant-Appellant*. | OPINION |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.21-50173 |
| *Plaintiff-Appellee*, | D.C. No. 8:16-cr-00076-JVS-21 |
| v. | |
| FRANCIS FRANK S. SCIMECA, AKA Francis S. Scimeca, AKA Francis Samuel Scimeca, AKA Frank Scimeca, AKA Frank Samuel Scimeca, | |
| *Defendant-Appellant*. | |

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

  v.

TAMMI L. WILLIAMS,

        *Defendant-Appellant*.

No.21-50210

D.C. Nos.
8:16-cr-00076-
JVS-18
8:16-cr-00076-
JVS

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

  v.

JONATHAN M. BRIGHTMAN,

        *Defendant-Appellant*.

No.21-50216

D.C. No.
8:16-cr-00076-
JVS-14

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

  v.

SHARON SCANDALIATO VIRAG,
AKA Sharon Kiefer, AKA Sharon
Scandaliato, AKA Sharon Scimeca,

No.21-50239

D.C. No.
8:16-cr-00076-
JVS-16

AKA Sharon Virag,

*Defendant-Appellant.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

LEAH D. JOHNSON, AKA Leah Johnson, AKA Leah Domitilla Johnson, AKA Leah D. Ortiz, AKA Joeahh Domitilla Viszolay,

*Defendant-Appellant*.

No.21-50258

D.C. No. 8:16-cr-00076-JVS-12

Appeal from the United States District Court for the Central District of California James V. Selna, District Judge, Presiding

Argued and Submitted September 13, 2023 Pasadena, California

Filed April 9, 2024

Before:  Milan D. Smith, Jr., Michelle T. Friedland, and Eric D. Miller, Circuit Judges.

Opinion by Judge Friedland

# SUMMARY[*]

## Criminal Law

The panel vacated six defendants' convictions for mail fraud and/or conspiracy to commit mail fraud arising from the defendants' sales companies' tactics in selling printer toner, and remanded.

The thrust of the Government's case was that a sales company representative would call a business, falsely imply that the sales company was the business's regular supplier of toner, and falsely state that the price of toner had increased. The representative would then state that the business could lock in the old price by purchasing more toner that day.

The Government argued, and the jury was instructed, that if the defendants had made a misrepresentation that would be expected to and did cause a business to part with money, that constituted fraud. The defendants argued that this theory of fraud was overbroad because it permitted the jury to convict even though all of the businesses received the toner they ordered at the agreed price.

The panel explained that not just any lie that secures a sale constitutes fraud; the lie must instead go to the nature of the bargain. The panel held that the Government's theory of fraud in this case was overbroad because it did not require the jury to find that the defendants deceived customers about the nature of the bargain. The Government did not argue that any error in this regard was harmless, and the panel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concluded that the criteria for considering harmlessness sua sponte were not satisfied.

---

## COUNSEL

Rajesh R. Srinivasan (argued) and Benjamin D. Lichtman, Assistant United States Attorneys; Bram M. Alden, Assistant United States Attorney, Chief, Criminal Appeals Section; United States Attorney's Office, Los Angeles, California; Gregory W. Staples and Bradley E. Marrett, Assistant United States Attorneys; Mack E. Jenkins, Assistant United States Attorney, Chief, Criminal Appeals Section, E. Martin Estrada, United States Attorney; United States Attorney's Office, Santa Ana, California; for Plaintiff-Appellee United States of America.

Benjamin L. Coleman (argued), Benjamin L. Coleman Law PC, San Diego, California, for Defendant-Appellant James R. Milheiser.

Karren Kenney, Kenney Legal Defense Corporation, Costa Mesa, California, for Defendant-Appellant Leah D. Johnson.

Correen W. Ferrentino, Ferrentino & Associates, Inc., Newport Beach, California, for Defendant-Appellant Tammi L. Williams.

Katherine K. Windsor (argued), Law Office of Katherine Kimball Windsor, Pasadena, California, for Defendant-Appellant Jonathan M. Brightman.

Shaun Khojayan (argued), Law Offices of Shaun Khojayan & Associates PLC, Los Angeles, California, for Defendant-Appellant Francis Scimeca.

Anne M. Voigts (argued), King & Spalding LLP, Palo Alto, California; Blythe G. Kochsiek, Amanda Farfel, and Samuel C. Cortina, King & Spalding LLP, Los Angeles, California; for Defendant-Appellant Sharon S. Virag.

Benjamin B. Wagner, Gibson, Dunn & Crutcher LLP, Palo Alto, California; K. Bartlett Jordan, Gibson Dunn & Crutcher LLP, Irvine, California; for Defendant-Appellant Gilbert N. Michaels.

## OPINION

FRIEDLAND, Circuit Judge:

Defendants-Appellants Jonathan Brightman, Leah Johnson, James Milheiser, Francis Scimeca, Sharon Virag, and Tammi Williams (collectively, "Defendants") appeal their fraud convictions for their sales companies' tactics in selling printer toner.[1] The thrust of the Government's case was that a sales company representative would call a business, falsely imply that the sales company was the business's regular supplier of toner, and falsely state that the price of toner had increased. The representative would then state that the business could lock in the old price by purchasing more toner that day. The Government argued, and the jury was instructed, that if Defendants had made a misrepresentation that would be expected to and did cause a business to part with money, that constituted fraud.

---

[1] An additional defendant, Gilbert Michaels, passed away during this appeal, and our court granted an unopposed motion to remand his appeal with instructions to vacate the judgment against him and dismiss his indictment.

Defendants argue that this theory of fraud was overbroad because it permitted the jury to convict even though all of the businesses received the toner they ordered at the agreed price.

We hold that the Government's theory of fraud was overbroad because it did not require the jury to find that Defendants deceived customers about the nature of the bargain. The Government has not argued that any error in this regard was harmless, and the criteria for considering harmlessness sua sponte are not satisfied here. We therefore vacate Defendants' convictions.

## I.

### A.

Defendants each owned or managed a sales company that telemarketed printer toner.[2] Their sales companies all worked closely with the same toner supplier, GNM Financial Services, which was run by Gilbert Michaels. GNM controlled the sales companies' price ranges, fulfilled toner orders, and investigated and resolved customer complaints about the sales companies. GNM also held mandatory group meetings with representatives of all the sales companies.

### B.

A grand jury indicted Defendants for mail fraud under 18 U.S.C. § 1341 and conspiracy to commit mail fraud under 18 U.S.C. § 1349. It also indicted over a dozen co-defendants, but the Government later dismissed the charges against two, and the rest eventually pleaded guilty.

---

[2] Printer toner serves the same role as ink. Laser printers use toner, and inkjet printers use ink.

Defendants proceeded to a joint jury trial. At the trial, the Government's opening statement accused Defendants of "a decade-long, multi-million-dollar telemarketing fraud built on deceiving victim employees, like receptionists, and selling toner." The Government then presented the testimony of various cooperating co-defendants who described the strategy the sales companies often used to convince businesses to buy toner. Several of the cooperating co-defendants explained that a sales company representative would first call a business and say she was calling regarding their copier. She would then ask for the model number of the copier, as well as the name of the person at the business who was responsible for ordering toner. Later, a representative from the same sales company would call again and ask for the person whose name was obtained in the first call and, by referencing the model number of the copier and offering them toner that went with that model, insinuate that she was calling from the business's regular supplier of toner. The sales company representative would then claim that her company had failed to report a recent increase in the price of toner, but that if the business placed an order, it could lock in the purported original price.

Some co-defendants testified to variations in tactics. One cooperating co-defendant, for example, testified that her company's sales were sometimes made over the course of a single phone call, rather than two phone calls. Another cooperating co-defendant referred to two separate strategies: the "price increase pitch" and the "regular supplier pitch."

Employees of businesses that purchased toner from Defendants' companies also testified about the sales calls. Some said that the calls led them to believe the caller was their regular supplier and that the caller mentioned a price increase. Others testified that the calls led them to believe

they were dealing with their regular supplier, but they did not say they were led to believe the price had gone up. At least one purchaser stated the opposite—that she was *not* led to believe that the caller was her regular supplier, only that toner prices were going up.

Whatever tactic was used, the sales company would fax an order confirmation form to any business that agreed to buy toner. The form reiterated the toner price that had been quoted on the phone. It also stated that the sales company might not be affiliated with the business's regular supplier and might have different prices from the regular supplier.

After the business signed the form, GNM shipped the toner. There was no evidence presented at trial suggesting that any businesses did not receive the toner or that any of the toner had defects.

Some purchasers testified that they would not have placed orders with the sales companies if they had realized they were not dealing with their regular supplier. One also testified that he would not have placed orders with the sales companies had he known the price of toner was not increasing.

An expert witness for the Government testified that many businesses lease printers or copiers from office products dealers, and those businesses receive toner as part of their service contract with that dealer. According to the expert, most businesses with such contracts pay a flat, per-page fee for their printer or copier and receive other supplies, such as toner refills, at no extra cost. Multiple witnesses testified that they already received toner refills under such a contract or under a similar arrangement also at no extra cost. Another purchaser testified that she called Office Depot whenever her business needed toner. And one testified that

she had an unspecified "arrangement" with a toner supplier and said the price offered by the sales company during their sales call seemed lower than the price the business usually paid.

At the close of the evidence, Defendants moved for a judgment of acquittal. They contended that even if a misrepresentation causes someone to enter into a transaction she otherwise would not have entered, that alone is not sufficient to constitute mail fraud—rather, the misrepresentation must go to the heart of the bargain. They cited out-of-circuit precedent holding that only misrepresentations going to the nature of the bargain, typically defined as price, quantity, or quality, constitute fraud. Here, Defendants argued, any misrepresentation about the identity of one of the bargaining parties did not deprive businesses of the benefit of the bargain because the businesses all received the toner at the agreed price. The district court denied the motion.

In earlier briefing to the district court, Defendants had also proposed a supplemental jury instruction that specifically would have required that the misrepresentation go to the nature of the bargain. That instruction would have stated:

> A scheme or plan for obtaining money by means of false statements requires an intentional misrepresentation for the purpose of obtaining money to which one is not entitled.
>
> A misrepresentation amounting only to deceit is insufficient even if it causes another

person to enter into a transaction that they would otherwise avoid.

Rather, the misrepresentation must be coupled with a contemplated harm to the person that affects the very nature of the bargain itself, such as a discrepancy between the benefits reasonably anticipated because of the misrepresentation and the actual benefit which was delivered.

The misrepresentation must be capable of affecting the person's understanding of the bargain and influencing their assessment of the value of the bargain. When the person receives exactly what they paid for, there is no fraud even if the person made the purchase because of the misrepresentation.

The Government objected to the instruction. It argued that "[a] mail fraud conviction can be sustained based on a material misrepresentation that induces a victim to part with money, even though the misrepresentation concerns something other than price or quality." The Government further contended: "[A]ny kind of false promise, statement, or representation can be 'material if it is made to induce action or reliance by another or has a natural tendency to influence or is capable of influencing another's decision.'" (quoting *United States v. LeVeque*, 283 F.3d 1098, 1103-04 (9th Cir. 2002)).

The district court agreed with the Government and did not give Defendants' proposed instruction. The district court did give the following instruction on the elements of mail fraud:

First, the defendant knowingly participated in a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property. You do not need to unanimously agree that a specific material false statement was made, provided that you all agree that a material false statement was made.

Third, the defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

Fourth, the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole.

An intent to defraud is an intent to deceive a consumer and deprive the consumer of something of value.

> A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use. It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

In its closing argument, the Government defined mail fraud as making a misrepresentation that would be expected to and does cause a person to part with money. Specifically, the Government set forth the elements of mail fraud as follows:

> Again to try to put it in normal people talk, these are the elements of mail fraud. Number one is a scheme or a plan to obtain money by means of false or fraudulent pretenses or statements.

> Now, some lawyers like to parse this out. What is the false pretense? Who cares? It's lying. It's cheating people and it's lying. Okay? That's what it is.

> The heart of it is when you lie to somebody on an important fact that causes them to give you money, you have defrauded them. That is mail fraud in a nutshell, with the exception you have to use the mail, which we'll get to.

> So it's a scheme that has to be material.
> That's just a lawyer word for it's important.
> It's important in the sense that it's something
> I would say to you that would cause you to
> part with money. Right? That's all it means.

In its closing, the Government also emphasized that, to return a guilty verdict, the jury only had to decide that Defendants had made one of two kinds of misrepresentation: "When you are selling overpriced toner to people who are already getting it at no extra charge, the only way you can do it is to lie to them. You use 'I'm your regular supplier,' or 'there's a price increase,' or some combination of the two." The Government argued that "both misrepresentations are important, and either one is enough to cause somebody to wrongfully part with money."

The jury deliberated for four days and ultimately found Defendants guilty on all counts.[3]

Defendants moved for a new trial or acquittal. Among other things, Defendants repeated their argument that the Government's theory was inadequate as a matter of law because it did not require the jury to find that anyone was deprived of the benefit of the bargain. In its opposition, the Government reasserted the arguments it had made against Defendants' proposed supplemental jury instruction. The district court denied the motions.

Defendants timely appealed.

---

[3] The Government dismissed the substantive mail fraud count against Defendant Williams in advance of trial and Defendant Virag during trial, so the jury convicted them only of conspiracy to commit mail fraud.

## II.

On appeal, Defendants argue that the Government presented an overbroad theory of fraud to the jury. We agree.

## A.

We review de novo whether the Government's theory of fraud at trial was legally valid. *See United States v. Yates*, 16 F.4th 256, 264 (9th Cir. 2021).

## B.

The federal mail fraud statute prohibits "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" when a person uses the mail in connection with that scheme. 18 U.S.C. § 1341.[4] The Supreme Court has interpreted this language to "prohibit[] only deceptive 'schemes to deprive the victim of money or property,'" *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (cleaned up) (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)), not those to deprive the victim of "intangible interests unconnected to property," *Ciminelli v. United States*, 598 U.S. 306, 315 (2023).[5] "Accordingly, the

---

[4] "Because the bank, mail, and wire fraud statutes all use highly similar language," we reference caselaw on federal bank, mail, and wire fraud interchangeably. *United States v. Miller*, 953 F.3d 1095, 1102 n.7 (9th Cir. 2020); *see also id.* at 1101 n.5.

[5] The phrase "scheme or artifice to defraud" is defined in 18 U.S.C. § 1346 to include schemes to "deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The Supreme Court has held that language does not protect other intangible rights, *Ciminelli*, 598 U.S. at 315, and covers only schemes involving bribes or kickbacks, *Skilling v. United States*, 561 U.S. 358, 408-09 (2010).

Government must prove not only that [] fraud defendants 'engaged in deception,' but also that money or property was 'an object of their fraud.'" *Id.* at 312 (quoting *Kelly*, 140 S. Ct. at 1571).

In conformance with these precedents, we have rejected the notion that depriving an individual of accurate information alone constitutes fraud. In *United States v. Yates*, for example, the government argued that two high-ranking bank executives engaged in a conspiracy to commit fraud when they "conceal[ed] the true financial condition" of a bank from its Board of Directors. 16 F.4th at 263. The government's theory was that "the primary purpose of the conspiracy . . . was to conceal the information." *Id.* at 265. We deemed this theory legally invalid, reasoning that the loss of "the right to make an informed business decision" cannot constitute the loss of "something of value." *Id.* (first quoting *United States v. Lewis*, 67 F.3d 225, 233 (9th Cir. 1995); then quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)). Otherwise, we reasoned, all deception would be federal fraud: "By definition, deception entails depriving the victim of accurate information about the subject of the deception." *Id.* And, under Supreme Court precedent, the scheme must be "one to deceive [the victim] *and* deprive [her] of something of value." *Id.* (quoting *Shaw v. United States*, 580 U.S. 63, 72 (2016)).

In other cases, we have made clear that even if misrepresentations result in money or property changing hands, they still may not necessarily constitute fraud. In *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), for example, we rejected the theory that the defendant engaged in federal wire fraud when he purchased products from American manufacturers but concealed the fact that those products would be sent to the Soviet Union. *Id.* at 467-

69. The manufacturers testified that they would not have sold to the defendant had they known the planned destination for the products. *Id.* at 466. Still, we reasoned that the manufacturers had "received the full sale price for their products" and "clearly suffered no monetary loss." *Id.* at 467. Although "they may have been deceived into entering sales that they had the right to refuse, their actual loss was in control over the destination of their products after sale." *Id.* We concluded that "the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law [wa]s not 'property' of the kind that Congress intended to reach in the wire fraud statute." *Id.* at 468. Under this reasoning, a misrepresentation does not constitute fraud if the person was not deceived about something essential to the bargain itself.

Decisions from our sister circuits are in accord. They articulate the rule as a requirement that a fraudulent misrepresentation must go to the "nature of the bargain," such as a good's price or quality. *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970). In *Regent Office Supply Co.*, for example, the Second Circuit held that it was not fraud for salespeople to "secure[] sales" of stationery by making various false statements about their relationships to the customers or the circumstances surrounding the sales. *Id.* at 1176, 1182. Salespeople falsely represented, for example, that they "had been referred to the customer by a friend of the customer" or that the "stationery of friends of the [salesperson] had to be disposed of because of a death and that the customer would help to relieve this difficult situation by purchasing it." *Id.* at 1176. The court explained that it could find "no case in which an intent to deceive has been equated with an 'intent to defraud' where the deceit did not go to the nature of the bargain itself." *Id.*

at 1182.  By contrast, when the misrepresentations "are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Id.*  The court therefore declined to hold that the defendants' actions constituted fraud "from the mere fact of the falseness of the representations and their connection with a commercial transaction." *Id.*

The Eleventh Circuit used similar reasoning in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016).  There, the court held that nightclub owners did not commit fraud when they hired women to lure men into their nightclubs to buy drinks without revealing that the women had been hired for that purpose.  *Id.* at 1310, 1314-16.  The court reasoned that a "'scheme to defraud' . . . refers only to those schemes in which a defendant lies about the nature of the bargain itself." *Id.* at 1313.  The Eleventh Circuit explained that such lies include misrepresentations about the price or characteristics of the good—for example, that a gemstone is a diamond when it is cubic zirconium, or that an item costs $10 when it in fact costs $20.  *Id.* at 1313-14.  But a lie, for example, that a seller is "the long-lost cousin of a prospective buyer" does not go to the nature of the bargain. *Id.* at 1314.  The court therefore concluded that the district court had erred in refusing to instruct the jury that they must acquit "if they found that the defendants had tricked the victims into entering a transaction but nevertheless gave the victims exactly what they asked for and charged them exactly what they agreed to pay." *Id.* at 1310, 1319.

Recently, in *United States v. Guertin*, 67 F.4th 445 (D.C. Cir. 2023), the D.C. Circuit embraced the same approach, holding that a federal employee who lied to maintain his

security clearance but was otherwise a satisfactory employee did not defraud his employer. *Id.* at 450-51. The court agreed with other circuits that have limited wire fraud "only to those schemes in which a defendant lies about the nature of the bargain itself." *Id.* at 451 (quoting *Takhalov*, 827 F.3d at 1314). It explained that this requirement is consistent with recent Supreme Court precedent because "[i]f an employee's untruths do not deprive the employer of the benefit of its bargain, the employer is not meaningfully defrauded of 'money or property' when it pays the employee his or her salary." *Id.* Instead, when "the employer receives the benefit of its bargain," *i.e.*, the employee's satisfactory work, "the employee's lie merely deprives the employer of honesty as such, which cannot serve as the predicate for a . . . fraud conviction." *Id.* (citing *Yates*, 16 F.4th at 267). The D.C. Circuit held that the lie on the employee's security clearance form did no more than cause the employer "to engage in 'transactions it would otherwise avoid, which does not violate the mail or wire fraud statutes.'" *Id.* at 452 (cleaned up) (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)).

We agree with the Second, Eleventh, and D.C. Circuits that not just any lie that secures a sale constitutes fraud, and that the lie must instead go to the nature of the bargain. That rule is consistent with our holding in *Yates* that the right to accurate information or to make an informed business decision does not constitute something of value under the federal criminal fraud statutes, 16 F.4th at 265, and with our holding in *Bruchhausen* that deception does not amount to fraud simply because it results in money changing hands, 977 F.2d at 467-68. The nature of the bargain requirement properly excludes from liability cases in which a defendant's misrepresentations about collateral matters may have led to

the transaction but the buyer still got the product that she expected at the price she expected.

A misrepresentation will go to the nature of the bargain if it goes to price or quality, or otherwise to essential aspects of the transaction. Whether a misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue. In *United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004), for example, we held that a defendant in California committed mail fraud when he falsely told potential investors that he was calling from an office in Washington, D.C., to make his operation seem bigger than it was. *Id.* at 1182-83. (He would also truthfully tell them that his business partner was located in California. *Id.* at 1182.) The defendant used that misrepresentation to secure investments in "businesses whose value and operations were fictitious." *Id.* at 1180. We rejected the idea that only "*direct* misrepresentations of the price, quality, or advantages of the transaction are material." *Id.* at 1183 (emphasis added). Instead, we held that materiality was satisfied because the "[d]efendant's misrepresentations were designed to give a false impression as to the size and nature of his own company as well as the businesses in which victims were being asked to invest." *Id.* Because investments are by nature speculative, whether the investment advisor has a large and successful operation will inform the nature of the bargain—it is relevant information about the value of the investor's purchase. *See United States v. Watkins*, 42 F.4th 1278, 1282 n.5 (11th Cir. 2022) ("[The defendant] lied about high-profile individuals being involved with [the proposed investment], which affected the nature of the bargain."); *cf. Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1282 (9th Cir. 1982) (holding, in applying federal securities laws, that "[a]ny significant relationship between" a director and

the company in which he was recommending buying shares "was material to an evaluation of his and the other directors' positive recommendations, which presumably were material to an evaluation of the tender offer itself"); *Vernazza v. SEC*, 327 F.3d 851, 858-59 (9th Cir. 2003) (holding that partners in an investment firm made materially false statements for the purposes of federal securities law when they falsely claimed not to have conflicts of interest in the securities they were recommending). By contrast, the size or success of a company selling a commodity would not necessarily affect the value of that commodity.

## C.

Under those principles, the Government presented an overbroad theory of fraud to the jury. The Government argued that a conviction for mail fraud requires only that a defendant make a false statement that would be expected to and did cause someone to turn over money—not that the false statement went to the nature of the bargain. The Government stated in closing: "When you lie to somebody on an important fact that causes them to give you money, you have defrauded them. That is mail fraud in a nutshell." The Government added only that to constitute mail fraud, the person must use the mail, and the misrepresentation "has to be material. That's just a lawyer word for it's important. It's important in the sense that it's something I would say to you that would cause you to part with money." It further argued: "The witnesses that we put on the stand . . . all said, 'yeah, if I had known that's not my regular supplier, I wouldn't have signed that fax confirmation form.' 'If I had known the prices weren't going up, I wouldn't have signed that fax confirmation.' That's what material means." The Government articulated the same broad theory of fraud in its opposition to Defendants' proposed supplemental jury

instruction and in its opposition to Defendants' post-trial motions.**[6]**

The jury instructions did not remedy the problem. The instructions did not tell the jury that, to support a conviction for fraud, a false statement must directly or indirectly deceive the victim about the nature of the bargain. Although Defendants requested such an instruction, the court declined to give it. Rather, the instructions stated that a misrepresentation was material if it "had a natural tendency to influence, or w[as] capable of influencing, a person to part with money or property."

A jury adhering to the Government's articulation of the elements of fraud in its closing argument, as well as in this jury instruction, could easily have convicted the defendant in *Bruchhausen*. That defendant told companies that all of the equipment he was buying would be used in the United States when it was actually being sent to West Germany and the Soviet Bloc, and representatives of those companies testified that they would not have sold to the defendant if they had known that. *Bruchhausen*, 977 F.2d at 466. There was therefore a false statement—about where the products were going—which would be expected to and did cause people to part with property. But we held in *Bruchhausen* that the false statements could *not* support a conviction for

---

[6] Indeed, at times the Government argued something even broader, contending that "any kind of false promise, statement, or representation can be 'material if it is made to induce action or reliance by another or has a natural tendency to influence or is capable of influencing another's decision.'" (quoting *United States v. LeVeque*, 283 F.3d 1098, 1103-04 (9th Cir. 2002)).

fraud.  *Id.* at 467-68.  *Bruchhausen* therefore belies the theory of fraud used at trial here.[7]

Because Defendants' conspiracy convictions rested on the same theory of mail fraud as the substantive mail fraud convictions, both sets of convictions suffer from the same error.

## III.

A "'constitutional error occurs' when a jury 'returns a general verdict that may rest on a legally invalid theory.'" *United States v. Yates*, 16 F.4th 256, 269 (9th Cir. 2021) (quoting *Skilling v. United States*, 561 U.S. 358, 414 (2010)). Ordinarily, after determining that there was a constitutional error at trial, we may nevertheless affirm the conviction if we are "'able to declare a belief that [the error] was harmless beyond a reasonable doubt,' in that it 'did not contribute to the verdict obtained.'" *Id.* (quoting *United States v. Holiday*, 998 F.3d 888, 894 (9th Cir. 2021)).  In such cases, the burden rests on the Government to establish harmlessness.  *See United States v. Brooks*, 772 F.3d 1161, 1171 (9th Cir. 2014).

---

[7] In its appellate brief, the Government suggested that Defendants committed mail fraud because they led businesses to overpay for toner. A deception about the market value of a commodity that was intended to cause the victim to pay an inflated price would go to the nature of the bargain and therefore could be a basis for a fraud conviction.  But the Government's closing argument made clear that its theory of fraud did not require above-market prices—any money changing hands was sufficient.  Nor did the jury instructions require the jury to find that Defendants' misrepresentations were aimed at inducing customers to pay above-market rates, or more than they would have paid under any existing supply contracts.  We therefore cannot affirm these convictions on the theory that the victims were induced to purchase toner at inflated prices.

Here, the Government did not argue harmlessness in response to Defendants' challenge to its theory of fraud. That omission does not appear to have been inadvertent. Defendants' central argument on appeal was that the Government presented an overbroad theory of fraud at trial. Indeed, it was Defendants' first argument in their joint opening brief and in their joint reply brief. The Government responded to the argument on the merits but did not argue that any such error was harmless. By contrast, in response to several of Defendants' other arguments about purported trial errors, the Government *did* argue that any such errors were harmless.

In prior cases, we have expressed hesitancy to raise harmlessness sua sponte, and for good reason. *See, e.g.*, *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100-01 (9th Cir. 2005); *United States v. Rodriguez*, 880 F.3d 1151, 1163-65 (9th Cir. 2018). Considering harmless error without arguments from the parties "will often burden reviewing courts," particularly when the analysis requires reviewing voluminous or complex records. *Gonzalez-Flores*, 418 F.3d at 1101. And "[e]ven more troubling," considering harmlessness sua sponte "may unfairly tilt the scales of justice by authorizing courts to construct the government's best arguments for it without providing the defendant with a chance to respond." *Id.*

In light of those concerns, we have held that we may address harmlessness sua sponte only in "extraordinary cases." *Brooks*, 772 F.3d at 1171. To identify such cases, we consider three factors: "(1) 'the length and complexity of the record,' (2) 'whether the harmlessness of an error is certain or debatable,' and (3) 'the futility and costliness of reversal and further litigation.'" *Id.* (quoting *Gonzalez-Flores*, 418 F.3d at 1101). The second factor is "of particular

importance"—"sua sponte recognition 'is appropriate *only* where the harmlessness of the error is not reasonably debatable.'"  *Id.* (quoting *Gonzalez-Flores*, 418 F.3d at 1101).  "[E]xercising our discretion to find a constitutional error harmless . . . requires a double level of certainty: we must be convinced that the error was 'harmless beyond a reasonable doubt' and that 'satisfaction of that standard is beyond serious debate.'"  *Id.* (quoting *United States v. Pryce*, 938 F.2d 1343, 1347-50 (D.C. Cir. 1991)).

In *Yates*, we declined to consider harmlessness sua sponte in circumstances similar to those here.  There, the government had relied at trial on an invalid theory of fraud to support a conspiracy conviction, and the defendants' appellate briefs prominently argued that the overbreadth of the fraud theory required the conspiracy convictions to be reversed.  16 F.4th at 270.  Despite that argument from the defendants, the government did not argue on appeal that the evidence made clear beyond a reasonable doubt that the jury would have convicted on a valid theory.  *Id.*  We held that it would be "inappropriate" to forgive the government's forfeiture.  *Id.* at 271.  We explained that "the record [was] long and complex"—the result of a 29-day trial "that featured 43 witnesses and 584 exhibits."  *Id.*; *see also id.* at 261.  We acknowledged that a review of the record might have revealed harmlessness as to some conspiracy counts, but that this was "hardly certain" given that at least some of the relevant facts were disputed.  *Id.* at 271.  We concluded that it would be unfair to the defendants to affirm on "a theory that was not advanced by the government and that [the defendants] have not had an opportunity to address."  *Id.* We further explained that there was no "basis for remanding to give the government an opportunity for a do-over after it

made the strategic choice not to address all of the defendants' arguments in its appellate brief." *Id.*

In light of the similarities between the situation here and the situation in *Yates*, we must likewise decline to reach harmlessness sua sponte. The trial here lasted 26 days and featured 43 witnesses and over 1,000 exhibits. The trial transcripts alone span over 5,000 pages. Deciding harmlessness here would be even more complicated than in *Yates*, which involved two defendants, *see id.* at 263, because we would have to parse which evidence was relevant to each of the six Defendants.

Moreover, we know that the enormous record contains variations in testimony about the sales tactics used and other circumstances of the purchases that might be relevant depending on the theory of fraud. Given those variations and the context-specific nature of fraud, it is not "certain" where we would start a harmlessness analysis, let alone where we would end.

## IV.

For the foregoing reasons we **VACATE** Defendants' convictions and **REMAND**.